Weldon, J.,
delivered the opinion of the court:
Oh the 14th day of July, 1808, the United States entered into a convention with the Republic of Mexico for the appointment and organization of a commission to adjust and determine such claims of citizens of the United States against the Republic of Mexico, and claims of citizens of said Republic against the United States, as had been presented to the government of either party to said convention for its interposition with the other since February 2, 1848; and which might be presented to the commissioners, to be appointed under said convention, within eleven months from the day of their first meeting. By the terms of the treaty the awards of the commission, or of the umpire appointed by it, were to have the force of absolute finality and conclusiveness, and operate as a settlement of such claims. The treaty was ratified by both parties on the 1st day of February, 1869, and proclaimed by the President of the United States on the 1st day of February, 1869. (15 Stat. L., 679).
The commissioners appointed by the respective parties held their first meeting on July 31,1869, and thereafter, in pursuance of the power vested in them, appointed an umpire.
The commissioners and -umpire who finally acted upon the claim which is in controversy in this proceeding were Mr. *485 Henry Wadsworth on behalf of the United States, Señor Don Manuel Maria de Zamacona on the part of Mexico,.and the Eight Honorable Edward Thornton, K. C. B., envoy extraordinary and minister plenipotentiary to the United States of her Majesty the Queen of Great Britain, as umpire. Mr. J. Hubley Ashton appeared as agent of the United States and Mr. Caleb Cushing as agent of Mexico. On or before the 30th of Juné, 1870, the United States, through their agent, presented to said commissioners, appointed as aforesaid, 873 claims, aggregating the sum of $470,126,613.40, and 144 claims, the amounts of which were not stated, and the Eepublic of Mexico, through its agent, presented to the commission 998 claims, aggregating the sum of $86,661,891.15. On the 19th of April, 1871, by a further convention, the time in which the commissioners were to decide claims was extended one year; and by further convention the time was extended to the commissioners and the umpire until the 20th of November 1876.
Pursuant to the power vested in said commissioner's, they made money awards to the United States (including those awarded by the decisions of umpires) in the sum of $4,125,622.20, in favor of Mexico in the sum of $150,498.41, and the difference between said amounts was paid by Mexico to the Secretary of State, in annual installments, as required by the several treaties aforesaid.
On the 17th of March, 1870, La Abra Silver Mining Company, by its attorneys, gave notice to the United States of the existence of a claim of said company against the Eepublic of Mexico for the sum of $1,930,000, for alleged damages and losses suffered by it in consequence of outrages and violence committed by the authorities of said Eepublic to and against the rights of said company in the years 1867 and 1868; the notice was, by the Secretary of State, referred to said commissioners, and the company on the 14th of June, 1870, filed with the commissioners a memorial in which it is substantially alleged that in the year 1865, under and by act of the legislature of the State of New York, the said company became a body corporate, that said company was chartered for the “ purchase and mining, melting, dressing and smelting, buying and selling argentiferous and other ores, minerals and metal;” that the stockholders were citizens of the State of New York, the *486 amount of capital stock $300,000, and the existence of the company limited to fifty years; that part of its business by the terms of its charter was to be carried on outside said State, to wit, at Tayoltita, in the State of Durango and in the mineral district of San Dimas, both in the Republic of Mexico. That shortly after said incorporation the company purchased valuable mines and haciendas in the States of Durango and Sin-aloa; that said mines purchased, as aforesaid, in Durango became and were known by the name of La Abra Mines; that upon becoming the proprietors of said mines, the said company proceeded with all possible dispatch to develop and improve the same; that in thepurchaseof the mine machinery and property incident to its successful operation the company invested the sum of $303,000; and that as a result of such improvement and expenditure, it was getting out of said mine's a large amount of rich ore and were in the act of realizing a profit of ^1,000,000 per annum; but it was compelled to abandon said mines by reason of the unfriendly and illegal acts and conduct of the officials of the Republic of Mexico; that intense prejudice existed in the public mind against all Americans; that such prejudice was intensified by the belief that the United States intended to annex said States to the dominion and territory of the United States; that the agents and,servants of said company were arrested without cause; and acts of violence were committed against the property of the company which were encouraged by the authorities of Mexico; that the servants of the said company while in the performance of their duty were intimidated, killed, and driven out by the Mexican people; that the authorities made no effort to protect the property of the company, and that the purpose was to obtain possession and control of said property. It is further alleged that in consequence of such treatment the company was compelled to abandon its mine and other valuable property, which at the time of abandonment was a damage to the company of $3,000,030.
Tt is further alleged that at the time of the abandonment as aioresaid, the said company was compelled to abandon one thousand tons of ore, worth at the time the sum of $500,000, and which was wholly lost; that the profits of the company if permitted to work the mines would have been at the rate of *487 $1,000,000 per annum; that in consideration of the premises the loss to the company is $3,000,030; that the whole amount of the claim belongs to the company; that it has not recovered any indemnity for said claim; that the claim was not presented prior to January 1,1869, to the Department of State of either G-overnment, or to the minister of the United States at Mexico.
Such proceedings in relation to said claim were had: that the same was heard by the said commissioners on the memorial and evidence aforesaid on or about the 19th day of May, 1875; that after hearing and considering said claim, said commissioners differed in opinion as to the allowance thereof, Commissioner Zamaeona delivering his opinion that said claim should be rejected altogether, on' the ground that the evidence in support thereof was insufficient, false, and in part procured by fraud, and that it was outweighed by the defensive evidence, and Commissioner Wadsworth delivering his opinion in the words and figures following, to wit:
“The company in my opinion is entitled to indemnity for the seizures of its money, supplies, mule trains, and other property by the Mexican armed forces, under command of their officers, undoubtedly for the use of such troops, and for the destruction of the mining property and interests of the company by the various Mexican authorities, civil and military.
“ The amount of money seized and taken by force, according to the proof, as I read it, was altogether $2,978. The value of the several mule trains and supplies seized and appropriated for the public use I make, say, $75,000. The property and interests destroyed in addition, by the arbitrary, lawless, and malicious acts of the authorities, amounted to a large sum, difficult to estimate, but equal in my judgment to the.total investment made by the company, less the aggregate of the money, teams, and supplies taken as above stated.
“ Upon these sums the claimant should have interest in lieu of prospective profits.
“ The profits of mining in Mexico during civil war (that is at all times nearly) and under the extraordinary circumstances surrounding claimant are more than doubtful. But I do not consider prospective profits even a part of the measure of damages in such cases. They are at best speculative, while interest is a definite and moderate allowance that may, with great propriety, take their place.
“ It is, however, idle for me to go into this important case with any particularity, since it must go to the umpire to be disposed of by him according to his views alone.”
*488 And thereupon said claim was referred to Sir Edward Thornton, umpire, for his decision upon the points of disagreement between said commissioners.
Thereafter, on the 37th day of December, 1875, he decided that the said Bepublic of Mexico should pay, on account of said claim, the sum of $358,791.06, for the expenditures of said' defendant La Abra Silver Mining Company, with interest on said sum, and the further sum of $100,000 for the value of the unreduced ores alleged to have been extracted from said mines and abandoned by said defendant company, with interest on said last-named sum, and delivered his opinion in the words and figures following, to wit:'
“La Abba Miking- Company v. Mexico, No. 489. “AWARD 03? THE UMPIRE.
“With reference to the case of ‘La Abra Silver Mining-Company v. Mexico,’ No. 489, the umpire is fully satisfied and can not doubt that the company is entitled to be considered a corporation, or company of citizens of the United States, in accordance with the terms of the convention of July 4, 1868, .having been duly chartered in conformity with the lairs of the State of New York.
“ He is also of opinion that the enterprise upon which the claimants entered, of purchasing, denouncing, and working certain mines in the State of Durango, in Mexico, was a serious and honest business transaction on their part, and that there was nothing rash, deceitful, or fraudulent in it, but that it was engaged in with the sole intention of carrying out legitimate mining operations.
“ There is no doubt that the Mexican Government was very desirous of attracting foreigners to the Bepublic, and of indu-cin g them to bring their capital into it and raising up industrial establishments of all kinds. With this view it issued proclamations encouraging the immigration of foreigners, and promising them certain advantages and full protection. It can not be denied that the claimants were justified in placing confidence in these promises. They complain, however, that the local authorities of the district in which their mines and works connected with them were situated did not fulfill the engagements entered into by their Government, but, on the contrary, behaved toward them in an unfriendly and hostile manner. The ground of their claim is that these hostilities were carried to such an extent that they were finally compelled to abandon their mines and works and to leave the Bepublic.
“The evidence on the part of the claimants is, in the umpire’s *489 opinion, of great weight; the witnesses are, for tbe most part, highly respectable and men of intelligence, and their testimony-bears the impress of truth. Notwithstanding what is stated to tbe contrary by the witnesses produced by the defense, the umpire is constrained to believe that the local authorities at Tayoltita and San Dimas, far from affording to the claimants that protection and assistance which had been promised them by the Mexican Government, and to which they were entitled by treaty, not only showed themselves a spirit of bitter hostility to the company, but encouraged their countrymen who were employed by the claimants in similar behavior, and even frightened them into refusing to work for their American employers. The conduct of these authorities was such, and the incessant annoyance of and interference with the claimants was so vexatious and unjustifiable, that the umpire is not surprised that they considered it useless to attempt to carry on their operations, and that for this reason, as well as from the well-grounded fear that their lives were in danger,.they resolved to abandon the enterprise. These facts are not, in the umpire’s opinion, at all refuted or even weakened by the evidence submitted by the defense; on the contrary, he believes that the local authorities were determined to drive the claimants out of the country.
“ It appears that the superintendent of the mines took such steps as he could to obtain protection from these authorities, and, finding his efforts in vain, he appealed, through a lawyer of high character, to the highest authorities in the State, who declined to interfere in the matter. To suppose tha,t, when so determined a spirit of hostility on the part of the local authorities (one of whom was the jefe politico, who wielded great power) and so much indifference by the State government were displayed toward the claimants, it would have been of any avail to appeal to the courts of justice would be puerile. In short, the umpire does not see what else, in presence of such opposition to their efforts, the claimants could do but abandon the enterprise.
“ The umpire is of opinion that the Mexican Government, which, with a spirit of liberality which does it honor, encouraged all foreigners to bring their capital into the country, is bound to compensate the claimants for the losses which they suffered through the misconduct of the local authorities. What the amount of this compensation should be it is very difficult to decide. The umpire is of opinion that the claimants should be reimbursed the amount of their expenditures . and also the value of the ores extracted which they were forced to abandon, with interest upon both these sums. He can not consent to make any award on account of prospective gains, nor on account of the so-called value of the mines. Mining is proverbially the most uncertain of undertakings;, mines of the *490 very best reputation and character suddenly come to an end either from the exhaustion of the veins or from flooding or from some of the innumerable difficulties which cross the miner’s path. A certain interest upon the money invested is a much surer compensation than prospective gains$ the latter are, in fact, the interest upon the sums invested. They may be greater or less or none at all, and there may be even great losses of capital. To award both interest and prospective gains would be to award the same thing twice over. The so-called value of the mines must depend upon the prospective gains. It may be great, small, or nothing, and may be but a mere snare to lead one on to utter ruin. It is, in the opinion •of the umpire, equally inadmissible that the Mexican Government can be,called upon to pay a value, the amount of which, even approximately, it is impossible to decide. A moderate interest on the amount invested in the business and upon the amount of the ores reduced and of those extracted and deposited at the reduction works is a further compensation which, in the opinion of the umpire, that Government ought to pay.
“The evidence of George O. Collins, with regard to the amount invested, is clear and straightforward. He states it to be—
From subscriptions and sales of stock..$235,000.00
Lent and advanced. 64,291.06
Due for rent, expenses, salaries, law expenses. 42,500.00
341,791.06
“Any so-called ‘forced loans’ and contributions must have been paid out of this amount. To charge them, therefore, separately is to make the same charge twice over. The umpire takes occasion,, however, here to observe that a forced contribution exacted upon a train of goods, the property of the company, in transit from a seaport or elsewhere to the mines, is not in the nature of a forced loan. The fatter should be recovered by the proper authorities, at the headquarters of the company, and should be in the same proportion as that imposed upon all the inhabitants of the country. The former is an arbitrary exaction which is frequently much more prejudicial than the actual money loss, on account of the detention and abstraction of goods without which the mining operations can notproceed. To the above-mentioned amountof $341,791.06 should be added $17,000, which is shown to have been the amount derived from reduced ores.
“ The umpire is satisfied, from the respectable evidence produced, that a large quantity of valuable ore had been extracted from the mines and deposited at the company’s mill, and that it was there when the superintendent was compelled, by the conduct of .the local authorities, to abandon the mines and cease working them. But the umpire is of opinion that there
*491 is not sufficient proof, nor indeed sucb proof as might liave been produced, that the number of tons stated by the various witnesses were actually at the mill, or at the mines, at the time of the abandonment. In so well regulated a business as the umpire believes that it really was, he can not doubt that books would have been kept in which the daily extraction of ores would have been regularly noted down, and that periodical reports would have been made to the company at New York. Neither books nor reports have been produced, nor has any reason been given for their nonproduction. The idea formed, even by persons intelligent in the matter, of the quantity of a mass of ore must necessarily be vague and uncertain, and that of its average value still more so. Still, the umpire is strongly of opinion that claimants are entitled to an award upon this portion of the claim...
“ He will put it at $100,000. It is possible that it is much less than the real value of the ores, but in the absence of sufficient documentary proof, and considering the fact that the expenses of reduction are great and sometimes even much greater than is anticipated, he does not think that he would be justified in making a higher award. Neither should interest be allowed on this amount so soon as on the others, for the reduction of the ores would have taken time — say a year. It is not shown that the company had received any dividends before the period of the forced abandonment of the mines, about March 20,1868. Neither ought interest to be awarded before that date.
“The umpire therefore awards that there be paid by the Mexican Government, on account of the above-mentioned claim, the sum of three hundred and fifty-eight thousand seven hundred and ninety-one Mexican gold dollars and six cents ($358,791.06), with an annual interest of 6 per cent from March 20,1868, to the date of tbe final award; and further, the sum of one hundred thousand Mexican gold dollars ($100,000), with the same interest from March 20,1869, to the said date of the final award.
“Bdw. Thornton.
“Washington, December 27,1875.”
Thereafter, on the 29th day of January, 1876, and the 19th day of September, 1876, Mr. Avila, agent for the Republic of Mexico, filed with the umpire a motion for a rehearing of the claim, on the grounds set forth in the opinion of Mr. Zama-cona, commissioner, as aforesaid, and on the further ground that the allowance of $100,000 with interest on the value of unreduced ores was invalid, because no allowance for the ores had been made by Mr. Wadsworth, commissioner, and the question of such allowance had not been referred to the *492 umpire. But the umpire, ou the 20th day of October, 1876, denied the motion for rehearing, and on the 20th day of November, 1876, the functions of the umpire terminated, as provided by the convention of April 29,1876, aforesaid. By a decision of the umpire, dated July 31, 1876, that date was fixed as the date to which interest on all claims was to be computed, therefore the award on the claim of the said defendant company, including interest, amounted to $683,041.32.
In the year 1877 the authorities of the Bepublic of Mexico were advised, as it is alleged, that certain testimony offered on the part of said company was false, and procured by use of money in the subornation of witnesses; and in said year were further informed, that since the proceeding before the commissioners, important and material testimony had been discovered, which, if presented to the commissioners and umpire, would have changed the result of the examination of said claim. On the 18th Jane, 1878, Congress passed an act, chapter 262 (20 Stat. L., 144), directing the distribution of the fund paid by Mexico under the decree and judgment of tiie commission; but authorized the President to investigate any charges of fraud presented by the Mexican Government with respect to the claim of said mining company; and if in the opinion of the President “ the honor of the United' States, the principles of public law, or considerations of justice and equity, required that the award in the case of the said mining company should be opened and the case retried, it should be lawful to withhold payment of the award to said company, until such case should be retried, and decided in such manner as the governments of the United States and Mexico might agree, or Congress should otherwise direct.”
On the 8th day of August, 1879, in pursuance of the provisions of said act, the Secretary of State of the United States, in a report to the President, stated that the evidence presented by the Bepublic of Mexico in said claim brought in grave doubt the sincerity of the evidence as to the measure of damages, and that the honor of the United States required a further investigation of the claim.
The Secretary further said:
“Third. The executive government is not furnished with the means of instituting and pursuing methods of investigation which can coerce the production of evidence or compel *493 tbe examination of parties and witnesses. Tbe authority for such an investigation must proceed from Congress. I would advise, therefore, that the proofs and conclusions you shall come to thereon, if adverse to the immediate payment on these awards of the installments received fr'om Mexico, be laid before Congress for the exercise of their plenary authority in tbe matter.
u Fourth. It may be that, as the main imputation in the case of the La Abra Silver Mining Company is of fraudulent exaggeration of the claim in its measure of damages, it may consist with a proper reservation of further investigation in this case to make the distribution of the installments in hand.
“I have this subordinate consideration still under examination, and, should you entertain this distinction, will submit my further conclusions on this point.”'
Said opinion was approved and adopted by the President,' and thereafter, on the 3d day of September, 1879, the Secretary further reported to the President:
“The parties interested in the case of the La Abra Mining Company having desired from you a further consideration of the,point reserved in my former statement to you of my views in that case, and the matter having been referred to me to that end, I respectfully submit my conclusion on that point.
“1. Upon a renewed examination of the matter as laid before me by the Mexican Coyernment, I am confirmed in the opinion that the proper limits of the further consideration which the honor of the Government should prompt it to give to this award should confine the investigation to the question of a fraudulent exaggeration of the claim by the parties before the commission to which, under the provision of the convention, it was presented by this Government.
“2. Upon a careful estimate as to any prpbable or just reduction of the claim from further investigation, should Congress institute it, and under a sense of thé obligation of the executive government to avoid any present deprivation of right, which does not seem necessary to ultimate results, I am of opinion that its distributive share of the installments thus far received from Mexico may properly be paid to the claimant, reserving the question as to later installments.
“ If this conclusion should receive your approval, the payment can be made upon the verification at the Department of State of the rightful parties to receive it.”
In pursuance of the recommendation of the Secretary, there has been paid to the said mining company from time to .time, until the amount received by the United States has been diminished to the sum of $403,030.08, which now remains in the possession of the Government.
*494 Because of tbe alleged fraud against tbe justice and fairness of tbe award, an attempt was made to submit tbe question to a new convention; but tbe effort failed in consequence of tbe rejection of tbe treaty by tbe Senate of tbe United States. Tbe matter being unadjusted, and tbe money still remaining in tbe possession of tbe United States in December, 1892, there was passed and approved an act, as follows:
“An act to amend and enlarge tbe act approved June eighteenth, eighteen hundred and seventy-eight, entitled ‘An act to provide for the distribution of tbe awards made under tbe convention between tbe United States of America and tbe Bepublic of Mexico, concluded on tbe fourth day of July, eighteen hundred and sixty-eight.’
“ Whereas tbe Secretary of State, after investigating the charge of fraud presented by tbe Mexican Government as to tbe case of La Abra Silver Mining Company, has heretofore reported that tbe ‘honor of tbe United States requires’ that said case ‘ should be further investigated by the United States, to ascertain whether this Government has been made tbe means of enforcing upon a friendly power claims of our citizens based upon or exaggerated by fraud,’ but that ‘the executive government is not furnished with means of instituting and pursuing methods of investigation which can coerce the production of evidence or compel the examination of parties and wi; nesses,’ and that ‘ the authority for such an investigation must proceed from Congress;’ and
“Whereas the President of the United States has transmitted to Congress the recommendation of the Secretary of State that said case ‘be referred to the Court of Claims, or such other court as may be deemed proper, in order that the charge of fraud made in relation to said claim may be fully investigated: ’ Therefore,
“ Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That in further execution of the purpose of said act the Attorney-General of the United States be, and he is hereby, authorized and directed to bring a suit or suits in the name of the United States in the Court of Claims against La Abra Silver Mining Company, its successors and assigns, and all persons making any claim to the award or any part thereof in this act mentioned, to determine whether the award made by the United States and Mexican mixed commission in respect to the claim of the said La Abra Silver Mining Company was obtained, as to the whole sum included therein or as to any part thereof, by fraud effectuated by means of false swearing or other false and fraudulent practices on the part of the said La Abra Silver Mining Company, or its agents, attorneys, or assigns; and, in case it be so determined, to bar and foreclose all claim in law *495 or equity on the part of said La Abra Silver Mining Company, its legal representatives or assigns, to the money, or any such part thereof, received from the Republic of Mexico for or on account of such award; and any defendant to such suit who can not be found in the District of Columbia shall be notified and required to appear in such suit by publication as the court may direct, in accordance with law, as applicable to cases in equity.
“ Sec. 2. That full jurisdiction is hereby conferred on the Court of Claims to hear and determine such suit and to make all interlocutory and final decrees therein, as the evidence may warrant, according to the principles of equity and justice, and to enforce the same by injunction or any proper final process, and in all respects to proceed in said cause according to law and the rules of said court, so far as the same are applicable. And the Secretary of State shall certify to the said court copies of all proofs admitted by the said mixed commission on the original trial of said claim, and the said court shall receive and consider the same in connection with such competent evidence as may be offered by either party to said suit.
“ Sec. 3. That an appeal from any fii\al decision in such cause to the Supreme Court of the United States may be taken by either party within ninety days from the rendition of such final decree, under the rules of practice which govern appeals from said court; and the Supreme Court of the United States is hereby authorized to take jurisdiction thereof and decide the same.
“Sec. 4. That in case it shall be finally adjudged in said cause that the award made by said mixed commission, so far as it relates to the claim of La Abra Silver Mining Company, was obtained through fraud and effectuated by means of false swearing, or other false and fraudulent practices of said company or its assigns, or by their procurement, and that the said La Abra Silver Mining Company, its legal representatives or assigns, be barred and foreclosed of all claim to the money or any part thereof so paid by the Republic of Mexico for or on account of such award, the President of the United States is hereby authorized to return to said Government any money paid by the Government of Mexico on account of said award, remaining in the custody of the United States, that has not been heretofore distributed to said La Abra Mining Company or its successors and assigns, which such court shall decide that such persons are not entitled, in justice and equity, to receive out of said fund.
“ Sec. 5. That, during the pendency of said suit and until the same is decided, it shall not be lawful for the Secretary of State to make any further payments out of said fund, on account of said award, to La Abra Silver Mining Company, or its legal representatives, attorneys, or assigns; and in case it shall be *496 finally adjudged in said cause either in the Court of Claims or in the Supreme Court of thp United States that the award made by said mixed commission, so far as it relates to the claim of La Abra Silver Mining Company, or any definable and severable part thereof, was not obtained through fraud as aforesaid, then the Secretary of State shall proceed to distribute so much of the said award as shall be found not so obtained through fraud, or the proceeds thereof remaining for distribution, if any, to the persons entitled ther'eto.
u Approved, December 28, 1892.”
In pursuance of the provisions and powers of said act, the Attorney-General, on the 30th of March, A. D. 1893, in behalf of the United States, filed a bill of complaint,' in which it is substantially alleged, inter alia, that the said comqiany was not compelled by threats or acts of the Mexican officials or people to abandon its mines, as stated in the memorial of the company, as hereinbefore alleged ; but that said claim was a sheer fabrication, and that every substantial allegation in said memorial contained is false; that the material testimony on which the award was made is and was false; and that tlie whole of said award was obtained by fraud, effectuated by means of false swearing, subornation of witnesses, and other false and fraudulent practices. It is further alleged, that in the1 year 1877 the Government of Mexico first learned of the existence of a press-copy book, containing letters and reports of the various superintendents of said company, and letters from the treasurer of said company, showing that the company was in possession of its mine until August, 1868, and that at said time the said mines were abandoned because of a lack of means on the part of the company, and because the working of the same was unprofitable; that the said company did not quit and abandon said mines because of the illegal act of the officers of Mexico; nor because of the illegal interference of the people of said Government.
It is alleged that the United States has obtained from the Republic of Mexico the said press-copy book, affidavits, letters, and documents, and files the same as Exhibit B to said bill. In further extension of the general allegations of the bill the complainant specifically charges as follows:
“ And your orator says that * * * Julius A. de Lagnel can and will, under oath, testify to the genuineness of the said press-copy book and of the letters of the said D. J. Garth,
*497 and to other important and material facts respecting the claim of said defendant La Abra Silver Mining Company; and that William F. Tuttle can and will testify to the genuineness of the said letters of the said Charles II. Exall; and that Charles B. Dahlgren, J. F. Gamboa, and J. M. Loaiza can and will testify that the affidavits purporting to have been made by them in support of said claim were false and were obtained by fraudulent practices; and that Frederick Sundell, A. B. Elder, llamón Hermosillo, Eugenio Somero, and Francisco Torres can and will testify that the material allegations of the,said memorial and the material testimony submitted, by said defendant company in support of said claim are false. And your orator says that the said documentary evidence and the said witnesses will enable your orator conclusively to show the facts in the fifteenth paragraph of this bill alleged, and also the following which your orator says are the facts, to wit:
“ That there was no hostility toward said defendant La Abra Silver Mining Company .on the part of Mexican officials or people, but that, on the contrary, their relations to its officers were friendly. That ‘prorogas,’ or extensions of title, were frequently granted to said company, and that said company received from officers of the Republican army special military protection for its property and for the mule trains belonging to contractors with said company during the war between the Republican Government of Mexico and the Imperialists. * * *
“That the superintendent was not imprisoned, but only told to consider himself in arrest (at his own hacienda) for alleged contemptuous treatment of a judge, and that he straightway complained to the prefect, after which no further restraint was imposed upon him. That no redress was denied the officers of the company, and no wrongs were inflicted upon them. That the officers of the company paraded their rights as American citizens, and Superintendent Bartholow proposed, if certain taxes were imposed upon him, to hoist the American flag, and to have them taken from under it by the military, the result of which threat was, as he explained it to Treasurer Garth in his letter of April 10,1866, that instead of paying three or four thousand dollars he only paid thirty. That when Garth instructed Superintendent Exall, in his letter of July 10, 1867, to be firm in maintaining his rights as an American citizen in any difficulties with the authorities, the latter replied, on the 6th day of October, 1867: ‘There is no difficulties about authorities, boundaries, or anything else concerning the mines and hacienda provided there is money on hand, and money must be sent.’
“That as early as May, 1867, the said Garth, treasurer of said company, advised Superintendent Exall, at the mines, that no more money could be sent him by said company; that a draft on said company for $5,000, drawn by Superintendent *498 De Lagnel through the Bank of California, had been protested, and that the said Exall must pay all expenses from the proceeds of the mines. And in July, 1867, the said Garth wrote the said Exall, £if it costs more than it coinés to, the sooner we find it out the better, and the sooner we stop the better for all parties concerned.’
“ That the ores extracted from the said mines were worthless, the only reduction made being of 90 tons in August, 1867, and yielding less than $6 per ton, which was not enough to pay the cost of mining, and the rest being so poor that, according to Exall’s report of October 6, 1867, it would not ‘pay to thow it in the river.’ That for this reason, if for no other, they were not carried off by Mexicans, and are still at the mines. * * *”
“That the said Granger remained in charge of the said mines and property until after August 12,1868, on which date he advised the Mexican collector of taxes that there were neither money nor effects to pay taxes on said mines, but that the superintendent would return in November, 1868, when the same would be paid.
“That the said Exall and the president of the said defendant company, George C. Collins, and the first superintendent of the said defendant company, Thomas J.Bartholow, grossly and fraudulently misstated and exaggerated, in their affidavits made in support of said claim, the amount of money expended by said defendant company in the purchase and operation of its mines and property, and that said defendant company expended in such purchase and operation much less than $200,000.
“That instead of paying gold for twenty-two twenty-fourths of La Abra mine, as was sworn by the said Bartholow, the said defendant company paid for such interest in La Abra mine in stock of the said defendant company, and that the remaining two twenty-fourths interest in said La Abra mine belonged to a. person who, although a claimant against Mexico before said commission, brought no claim on account of his said interest in said La Abra mine.
“ That instead of purchasing 550 feet in said Nuestra Señora de Guadalupe mine, as sworn by the said Collins, the said defendant company purchased 550 shares of the stoek of the Nuestra Señora de Guadalupe Mining Company, which company owned said last-named mine and made claim against Mexico before said commission, alleging that it had been forcibly compelled to abandon its Nuestra Señora de Guadalupe mine, which said claim was dismissed by said commission, wherefore said defendant company, even if it had been entitled to recover on any portion of its said claim against Mexico, was not entitled to recover for its investment in the stock of said Nuestra Señora de Guadalupe Mining Company.
“ That the investment of said company derived from reduction of its ores was only $420.09, instead of $17,000, as sworn *499 by tbe said Exall and allowed by said umpire in Ms said award.
“That instead of tbe unreduced ores extracted by said defendant company and abandoned at its said mines being worth $100,000, as estimated by tbe said umpire, from conflicting statements of witnesses for said defendant company and allowed by tbe said umpire in bis said award, said ores were absolutely worthless and would not pay tbe cost of reduction.
“That tbe affidavits of said J. F. Gamboa and said J. M. Loaiza so as aforesaid made in tbe month of May, 1870, and submitted to said commission by said defendant company were false and were procured by bribery and other unlawful means by tbe agent of said defendant company. And that tbe affidavit of tbe said Charles B. Dahlgren, as tbe same was submitted to said commission by said defendant company, was false and was not made by the said Dahlgren.
“Your orator further shows that by reason of tbe premises a. controversy has arisen between your orator and tbe defendants hereinbefore named, tbe said defendants claiming that it is tbe duty of your orator to pay over to them tbe sums by them, the said defendants, claimed respectively from tbe proceeds .of said award now in tbe possession of your orator, and your orator claiming that it is tbe right and duty of your orator to have tbe facts relating to said claim and award inquired of by your honorable court, and if it shall be adjudged by your honorable court that the said award was obtained through fraud effectuated by means of false swearing or other false and fraudulent practices on tbe part of tbe said defendant La Abra Silver Mining Company or its agents, attorneys, or assigns, to return tbe proceeds of said award to tbe said Republic of Mexico; that the said defendants have made persistent demands upon tbe Department of State and upon tbe Congress of your orator for tbe payment to them of said moneys, and that some of tbe defendants have brought suits in tbe courts of your orator to compel such payment, and that, unless restrained by tbe judgment and decree of this honorable court, the said defendants will continue to harass and annoy your orator with such demands and suits.
“ To tbe end, therefore, that tbe said defendants may, if they can, show why your orator should not have tbe relief hereby prayed, and that they and each of them, on oath, may full, true, direct, and perfect answer make to tbe matters and things aforesaid, and that as fully as if the same were here again repeated and they thereunto severally interrogated paragraph by paragraph.
“And that the said defendants and each and every of them may be compelled to disclose as aforesaid.
“And that the said defendants and each and every of them
*500 may, by the decree of tbis honorable court, be forever restrained and enjoined from setting np any claim to any part of said award or of the moneys now, as aforesaid, in possession of your orator.
“And that the said award on the claim of the said defendant La Abra Silver Mining Company may, by the decree of tliis honorable court, be declared to have been wholly obtained by means of false swearing a,nd other false and fraudulent practices on the part of said defendant company, its agents, attorneys, and assigns.”-
To the bill the defendants ñle a demurrer; but “not confessing all or any of the matters and things in the complainant’s bill of complaint alleged.” In connection with that reservation as to the truth of the allegations of the bill, the defendants say for cause of demurrer in Substance, that by the Constitution the subject-matter of the complainant’s suit is not within the jurisdiction of this court or of any court of the United States, but is within exclusive control of the Executive Department; that the question whether the award was obtained in whole or in part by fraud, and the question whether the whole or any part of the money should be returned by the President to Mexico, are not competent, fit, or proper, to be considered and determined by this court, or by any municipal court, but that the said questions are diplomatic or political,' and Congress has no -power to authorize a court to consider said questions as against the powers and discretions appertaining to the Executive Department of the Government of the United States; that the United States have no such interest in the matters alleged in the bill as will enable them to maintain this suit or entitle them to the relief; that the Government of Mexico is the party interested in this suit, and at all times since the discovery of the alleged frauds and injuries set forth in the said bill of complaint, the said Government of Mexico has had a remedy by suit against the alleged wrongdoers in the courts of the United States for the annulment of the said award, that by failing to prosecute such suit the Government of Mexico lias been guilty of laches, and has forfeited all rights to relief in equity, and that, therefore, the United States is not entitled to demand sucb relief for the benefit or in the interest of Mexico in tliis suit.
It is further averred that the mixed commission -which met under the treaty of July 4, 1808, is recognized by the law of nations and by the Constitution and laws, of the United States *501 as a court of exclusive and final jurisdiction, and that an award of such a commission is recognized by the law of nations and by the Constitution and laws of the United States as a judgment of a court belonging to the judicial system of the Government of the United States, and can not be set aside by a municipal court of the United States; that Congress can not grant a new trial in respect of matters determined by arbitration under such a treaty. Such an award can, on the part' of the United States, be reopened only by action of the treaty-making power of the Government, and that the question presented by the complainant’s bill is res judicata; that it appears on the face of the bill that the question is the same question that was tried by the commissioners under the treaty of July 4, 1808; such fraud and fraudulent practices having been charged by the Mexican agent and commissioner at the trial is res judicata, and can not be reexamined and redetermined by this honorable court.
It is also alleged the act of Congress under which this suit is prosecuted is unconstitutional on the further grounds that it assumes and undertakes to direct, control, and bind the •courts in adjudicating the question submitted for the finál adjudication of the courts named in the act; to receive evidence and apply legal principles to the said adjudication which are erroneous and wholly inadmissible according to law as administered in the courts of the United States in like cases; and such act undertakes to prescribe to the courts what weight and effect they shall give to the evidence, and how the courts shall reach the conclusion that said award was obtained in whole or part through fraud; that inasmuch and because the questions presented by the complainant’s bill are of apolitical and diplomatic nature, and not justiciable, or fit and proper to be considered and finally determined by a municipal court, Congress can not impose upon this honorable court, or upon the Supreme Court of the United States, or upon the judges thereof, the trial and determination of such questions.
Said act of Congress is void on the farther ground that it was never approved by the President of the United States as required- by law, the only alleged approval which it ever received being'on the 28th of December, A. D. 1892, when Congress was not in session, both Houses of Congress having-adjourned on the 22d of December, A/D. 1892, to the 4th of *502 January, A. D. 1893; that the complainant’s bill of complaint does not set forth fapts sufficient to constitute a cause of action or to warrant this honorable court in granting' any relief in the premises.
Wherefore, these defendants do demur thereto, and humbly pray the judgment of this honorable court.
The bill of complainant is very peculiar in form, and presents the anomaly of a pleading embracing by direct allegation (and by exhibits u which are made part of the bill” and asked to be considered as being directly averred) more than three hundred pages of closely printed matter. The demurrer, except for the purpose of demurrer, expressly reserves any admission of the truth of the allegations of the bill. But treating the bill as sufficiently definite and appropriate to accomplish the purpose of the statute conferring upon the court jurisdiction, and regarding the demurrer as sufficient to present the questions of law indicated by the demurrer, we proceed to consider the case upon the issues presented by the record.
This is one of the most extraordinary cases that has come within the jurisdiction of this court, either from the general law or by special act of Congress. In form, it is a suit between the United States and the Mining Company, and such persons as may have acquired an interest by assignment from the company. The United States have no pecuniary interest in the result of the proceeding, but, as a sovereign, are interested in preserving the rights of its citizens as they may be affected by the acts of a foreign government; and in the honor of the Government in not enforcing the payment of an unjust claim against one of the great family of nations. Aside from the question of national duty upon the part of the Government of the United States, the real parties in interest are the Republic of Mexico, La Abra Mining Company, and such citizens of the United States as have a pecuniary interest, by assignment, in the enforcement of the award against the Government of Mexico.
From the time the Government of the United States became aware of the fact that Mexico disputed the justice of the claim (after the award of tlm umpire), it has been most solicitous to deal justly between the parties, and has withheld from payment to the company a sum sufficient to indemnify Mexico against any fraud which may have been committed beyond what was *503 thought to be the substantial bounds of the loss of the company, as it may have existed in fact. The Mexican Government has sought, by an application to the United States for a new convention and treaty, to retry the cause, in the hope that it might by the introduction of new evidence, before another commission, lessen, if not entirely reverse, the judgment or award in favor of the company; but that application was unsuccessful, the Senate of the United States not concurring in the policy of again submitting the question to a new arbitration. The subject-matter of this controversy had been considered in all the branches of the United States Government, the legislative, executive, and judiciary, before it reached this jurisdiction by the terms of the act of December 28,1892; and many conflicting theories and opinions have been held and promulgated, both in relation to the justice of the claim and the power and duty of the United States to deal with the funds still held as a residue of the award. It has a history written in the proceedings of Congress, decisions of the highest court of the land, and in the action of the executive branch of the Government as it has been advised by the opinions and reports of able Secretaries of State.
The bill, in substance, is an allegation that the award is the result of fraud on the part of the company; and that, upon a retrial, the fraud will be shown. To the relief sought because of such alleged fraud, the defendants interpose, through the medium of the demurrer, many objections which will now be considered as they appear upon the face of the record.
Preliminary to the consideration of the question of jurisdiction, which is the first point raised by the demurrer, it may not be amiss to consider the delicate and responsible ground upon which we tread in the discussion and determination of that question. Underlying this controversy is a convention, a treaty, made between two independent and sovereign nations, in settlement of claims and contentions which, without such convention, could have been settled only by an appeal to arms, and the consequent infliction on both parties of the terrible consequence of war. Against the protestation of the party entitled to the residue of the award, the question of its fairness and integrity is collaterally submitted to this court, and we are called upon, in effect, to pass judgment upon the binding force of the finding and award of a mixed commission *504 sitting to decide upon international claims between independent and coordinate nations.
Arbitration as to international controversies is among tbe achievements of modern civilization, and is tlie result of that progress which regards the normal condition of nations in their relations to each other as a state of amity and friendship, instead of enmity, hatred, or ili will. The law of nations, under which it is practicable to settle disputes without the eonilict of war, is a result of that growth which nations have made from the barbarism of the past to the enlightenment of the present.
“The principle of the settlement of international difference by arbitral commissions is of such deep and wide-reaching interest to civilization, and the value of such arbitration depends so essentially upon the certainty and finality of its decision, that no government should lightly weaken its influence or diminish its consideration by making its action the subject of renewed discussion.” (Attorney-G-eneral Evarts’s opinion.)
Aside from the general law applicable to the decision and judgment of the arbitrators, in being obligatory upon the parties submitting the question to arbitration, it is expressly provided in the treaty, “The President of the United States of America and the President of the Mexican Eepublic hereby solemnly and sincerely engage to consider the decision of the commissioners conjointly, or of the umpire, as the case may be, as absolutely final and conclusive upon each claim decided upon by them, or him, respectively, and to give full effect to such decisions without objection, evasion, or delay whatsoever.” It is a general and fundamental principle of the law that the award of an arbitration whether sitting between individuals or nations, in the absence of fraud or mistake, is binding upon the parties to such arbitration. The obligatory efficacy of its judgment is implied in the very existence and purpose of its creation and being. It is organized and commissioned to settle disputes by the ascertainment and recognition of the rights and duties of the respective disputants; and to accomplish that purpose it must have impressed upon its findings the quality of finality. But like all general rules it is subject to qualifications and exceptions, and within those exceptions and qualifications the finality of a judgment may be questioned.
Upon the part of the complainants we are told that the position of the defense as exemplified in the demurrer, and *505 elaborated in the argument of counsel, calls upon the court to delare unconstitutional an act which passed the branches of Congress almost unanimously, received the sanction of the President, and which, from its declared purpose, subserves a great public interest in relieving the executive branch of the Government in the discharge of a very important duty toward the Bepublic of Mexico, and the disposition of a trust, recognized by the act of 1892, in a citizen of the United States. Upon the part of the defendants we are told that in the exercise of an assumed judicial power we are encroaching on the domain of the political and international function of the Government; that we threaten to disturb and destroy an award most solemnly made by a mixed commission in the discharge of the highest functions and prerogatives of international law; that the exercise of judicial power through the medium of domestic courts upon the part of one of the parties encroaches upon the integrity of such commission, in violation of international law, as recognized and adopted by this country in the Constitution of the United States. It will be seen by the statement of the issues how important and delicate is the judicial trust which we assume and discharge. The importance of preserving the fundamental law in the legislation of Congress, and the preservation of political power and inter, national questions from the consideration of the judiciary, can not be overestimated.
The consideration of the question of jurisdiction as raised by the demurrer and argument of counsel for the respondents involves the constitutionality of the act under which the bill was filed, and by virtue of which this court has proceeded thus far in the case. It being the expressed purpose of the act to confer jurisdiction on the court, if no jurisdiction is conferred it is because Congress exceeded its constitutional power in the passage of the act of December 28, 1892. The law provides a very complete, plain, and ample jurisdiction, to deal with the subject-matter of the controversy, in the broadest scope and exercise of judicial authority. The first and second gr'ounds of demurrer, substantially stated, are, that this court, nor any other court, has jurisdiction of the subject-matter of the complaint, and that it is within the exclusive control of the executive department of the Government; that the questions presented for the decision of the court are not justiciable questions, *506 but diplomatic in their nature, which Congress has no power to authorize the Court of Claims or the Supreme Court of the United States to finally adjudicate. If the doctrine stated by these objections be correct in principle, it follows as a logical necessity that the act of December 28,1892, is unconstitutional, and this court is without lawful authority to go beyond the decision of the question of jurisdiction.
The court in this connection is not unmindful of the sacredness of international arbitration, and the binding force of its judgments upon the parties to its records; but do the proceedings contemplated by the statute of 1892 lessen the force and respect due the awards and judgments of a mixed commission sitting in the settlement of an international claim ? Mexico has performed and discharged every duty it was bound to perform in relation to the award made by the tribunal. It has paid the last installment, and the money is now in the possession of the United States. It paid the money in the discharge of the debt created by the judgment of the arbitration. It is conceded in the demurrer that it is within the right of the United States to agree to a new convention, with power to retrythewhole case upon any and all grounds of dispute; but that the award can not be attacked, collaterally or directly, by a less power than the one from which it emanated. The complainant, upon the other hand, says the law, bill, and decree, if in pursuance to the prayer, do not attack the integrity of the award, and that the award, as such, is above and beyond their powers and purposes; that the award as a matter of law is unaffected by the proceedings authorized by the act of our jurisdiction.
The United States Government is the moving party in questioning the justice of the award, by the passage of the act of 1892, and in the prosecution of the cause against the company in pursuance to the powers of that act. It is the party in whose favor the award was made who attempts to inquire, in the form of this proceeding, as to whether the award in good conscience ought to jirevail to its full consummation. Can it be said, where one of the powers to an arbitration questions an award in its favor, that it is doing violence to that sanctity and sacredness which, from the policy of international law, surrounds the findings of an international tribunal? Nations and states are the only parties to an international tribunal, and so long as they keep faith with each other, in abiding by the *507 judgments and decrees of the common tribunal, the great purpose of compromise and settlement, by diplomacy, and not war, is accomplished. If the United States have become suspicions of the fairness of what they recovered from Mexico, there should be some way in which they can satisfy themselves on that point; and if it can be accomplished by a new convention, can not the same end be reached in some other mode? If Mexico had failed and refused to comply with the decree of the tribunal in the payment of the money, and was seeking some forum, against the protestation of the United States, to attack and nullify the award, it would be open to the objection of disregarding its duty as one of the contracting parties, and by those acts would not only violate an express provision of the treaty, but would be disregarding that higher law which, in the policy of modern civilization, protects as sacred the results of international commissions. If the rights of the person for whose property or grievance the. award was obtained can in the exercise of a discretion upon the part of the sovereign be subjected to a new inquiry through the medium of a new commission, can not the sovereign adopt some other mode of inquiry, if it desires to be more fully satisfied? Will the fact that the United States have sought to inquire through the instrumentality of a judicial investigation as to their duty in relation to the proceeds of the award impair the international force and dignity due the result and labors of the commission which sat under the provisions of the treaty of 1868? It seems to us that the passage of the act of 1892, and the proceedings under it, are not liable to that objection.
The constitutionality of the law and the consequent legality of the proceedings under it are to be determined, in a great measure, by considering and deciding the duty of the Government in relation to the right of the company in and to the claim which it alleged against the Republic of Mexico, and the relation of the company to the proceeds of the award received by the United States by the .judgment of the commission. It is sought to be maintained by complainant that originally the Government was possessed of all the property in the money obtained from Mexico, that it received and held it as a sovereign, unaffected by any trust of property in behalf of the defendants, that as sovereign it has a perfect and legal right to deal with it as such sovereign, *508 irrespective of any claim of tbe defendants, “that tbe specific money whose disposition is directed by the act of Congress of December 28, 1892, to be determined by this suit, were moneys of the United States and were not, before the passage of that act, subject to any right, legal, equitable, or moral, of defendants thereto.” As counter to this proposition, the defendants seek to maintain that the Government relations to this^award is that of trustee, and that the defendants are beneficiaries, or cestui que ■trusts, and that upon the recovery of a gross sum upon the part of the United States, including the claim of the company, a right became inherent in the company, amounting to property, and that such property is not subject to the judicial jurisdiction provided by the terms of the statute. Upon this branch of the controversy both parties cite the two cases which have been in the Supreme Court of the United States, having as the subject-matter of dispute the alleged right of the defendants to money still in the possession of the Government. (Frelinghusen v. Key, 110 U. S., 63, and Boynton v. Blaine 139 U. S., 306.)
In connection with this branch of the controversy, it was conceded on the part of the defense that if the company has no vested right of property in the award or its proceeds, it was then within the constitutional power of Congress to pass the act of 1892, and the defendants have no right to complain. The question in issue in this branch of the case turns upon the inquiry, whether the United States was, prior to the act of 1892, a sovereign, exercising’ only the political responsibility of a sovereign toward its citizens, or a trustee clothed with a duty to be performed in the recognition and protection of a property right in behalf of the defendants. In the case of Frelinglmysen, supra, it is said: “The treaty, when made, represents a compact between the governments, and each government holds the other responsible for everything done by their respective citizens under it.” * * * “ Thus, while the claims of the individual citizens were to be considered by the commission in determining the amounts, the whple purpose of the convention was to ascertain how much was due from one government to the other, on account of the demands of their respective citizens.” * # * “ International arbitration must always proceed on the highest principles of national honor and *509 integrity.” * * * “No technical rules of pleading as applied in municipal courts ought ever to be allowed to stand in the way of the national power to do what is right under all the circumstances.” * * * “ None of the cases cited by counsel are in opposition to this. They all relate to the dispositions to be made of the proceeds of international awards after they have passed beyond the reach of the governments and into the hands of private parties.”
The case of Boynton v. Blaine (139 U. S., 306) was a proceeding in mandamus to compel the Secretary of State to discharge what ivas alleged to be a mere ministerial duty in the execution of a trust in behalf oí the petitioners. In the decision of that case, on appeal, the Supreme Court sustained the Supreme Court of the District of Columbia in refusing the writ of mandamus. The opinion of the court quotes very largely from the opinion in the Frelinghuysen case; and as to the contention of the claimant that the Government had not now and never had any interest in the funds, and that the rejection of the new treaty by the Senate ousted all jurisdiction and control by the President, the court said that those propositions had been disposed of by the decision in Frelinghuysen v. Key and that the court had no disposition to recede. That opinion quotes with approval “ as between the United States and the claimants the honesty of the claims is always open to inquiry for the purpose of fair dealing with the Government against which, through the United States, a claim has been made.” In reference to the act of 1878 the court said: “Congress in furnishing the auxiliary legislation needed to carry the results of the convention under consideration into effect, requested the President to so far investigate certain charges of fraud as to determine whether a retrial ought to be had. This inquiry might have resulted in reopening the awards as between the two nations, dr in such reexamination as a domestic forum as would demonstrate whether the honor of the United States required a different disposition of the particular amounts in question.” # * So long as the political branch of the Government had not lost control over the subject-matter by final action the claimant was not in a position, as between himself and his Government, to insist on the conclusiveness of the award as to him.”
*510 In speaking of the disposition of the Frelinghuysen case and the act of 1878, the court says: “On the contrary, that control was expressly reserved, for it was made the duty of the President, if of the opinion that the cases named should be retried, to withhold payment until such retrial could be had in' an international tribunal, if the two Governments so agreed, or in a domestic tribunal if Congress so directed, and at all events until'Congress should otherwise direct. The fact that a difference of view as to whether the retrial should be international or domestic, may have arisen and led to delay, or that such difference may have existed on the merits, does not affect the conclusion. The inaction of Congress is not equivalent to a direction by Congress. The political department has not parted with power over the matter and the intervention of the judicial department can not now be invoked.”
TTpon the question of the character in which the Government acts in the presentation and enforcement of claims of the citizens, the counsel for the complainant relies on the case of Rustomjee v. The Queen (L. R. 1, Q. B. div., 487, L. R. 2, Q. B. div., 69).
In that case it was held “ that petition of right would not lie by one of the British merchants to obtain payment of a sum of money alleged to be due to him from one of the Chinese merchants.” In tlie treaty the sum of $3,000,000 was paid by China to England as part of the proceeds of an international arbitration in satisfaction of certain claims due British subjects for wrongs committed against their property Avhile resident in China. The sum was paid in gross, but the claim in question constituted a part of the basis on which the allowance of $3,000,000 was made. On appeal the judgment of the court below sitting in division was affirmed, the court of appeal holding (1), “That there was nothing in the terms of the treaty to make the Crown an agent or trustee in respect to any specific sum for the supplaint or any other person.” (2). “That in all that relates to the making and performing of a treaty in the other sovereign the Crown can not be either a trustee or agent for any subject.” The Chief Justice in his opinion says: “ To say that the Queen was agent for any person seems to me to be utterly unfounded upon any authority whatever.”
In the very able briefs of the counsel for the defendants they cite many cases tending to show that the company has a *511 right of property in the award made in favor of the United States, a part of it being for tbe amount allowed the company, all of which, we have carefully considered and some of which we proceed to examine. The leading cases in that connection were no doubt considered by the Supreme Court in the two cases referred to, and the court remarks that they related to “the disposition to be made of the funds after they had passed beyond the reach of the Government into the hands of private parties.” In the case of Comegys v. Vasse (1 Pet., 193) there ivas a contest between the bankrupt Vasse and the successors to his assignee in bankruptcy, after the payment of the funds into the hands of such successors. We have been unable to find a case in this country in which the controversy was between the Government and the citizen, except the two cases cited in the Supreme Court. In the case of Phelps v. McDonald (99 U. S., 298) the money, it is true, was still in the hands of the agent of the British Government, to whom it had been paid by the United States, and the Supreme Court recognized the right of parties to litigate as to it, before it had actually passed into the custody and control of private parties; but the proceeding did not affect the United States or the English Government, which might have dealt with the money as their interest or duty might dictate, without reference to the suit.
That the Government in this country may become a trustee under certain conditions of the law is well established. It has been held by the Supreme Court that with reference to the proceeds of captured and abandoned property it may become by provisions of law a trustee. In the case of United States v. Klein (13 Wall., 128) it is said “the act of March 12, 1863 (12 Stat. L., 820), to provide for the collection of captured and abandoned property within insurrectionary districts within the United States, does not confiscate or in any case absolutely divest the property of the original owner, though disloyal. By the seizure the Government constituted itself a trustee for those who were entitled or whom it should thereafter recognize as entitled.” Haycraft v. The United States (8 C. Cls., p. 483).
That a debt due an American citizen from a foreign government is property, and can not be taken without the right of compensation, is well-established law. Mead v. United States, (2 C. Cls. 224).
*512 The case of Judson v. Corcoran (17 Howard, 612) is cited by counsel for the defendants as establishing’ the doctrine that the award in this case created a legal title to the money in the company. That case was undoubtedly before the Supreme Court in the case of Frelinghuysen v. Key, and so was the opinion of .the Attorney-General in the Gibbs Case (13 Opinions 19). In the case of Judson v. Corcoran the contention was between two innocent assignees of a portion of the same claim, and the court held that Corcoran’s right was superior, because it was supported by a legal title, based upon the award of the commission appointed to settle the claims of citizens in the fund paid to the United States under the fifteenth article of the treaty of Guadalupe Hildalgo made on the 30th of May, 1848. It was not the award of the mixed commission, but a domestic commission, organized by the sovereign to settle disputes growing out of conflicting claims to the fund. The Supreme Court in the two cases of Key and Boynton did not consider that the case of Judson v. Corcoran had gone to the length of holding that La Abra and Weil had a legal title to a portion of the fund recovered from Mexico. The theory of the court in both cases is adverse to such a conclusion.
The duty of the United States with reference to the claims of its citizens upon foreign governments, is well stated by Judge Davis in the opinion in the case of Gray v. United States (21 C. Cls., 392), where it is said, “That any government has the right to do this (bar by treaty the right of American citizens against France in exchange for release by France of the United States from international obligations to France) as it has the right to refuse war in the prevention of a wronged citizen or to take other action which, at the expense of the individual, is most beneficial to the whole people is too clear for discussion. Nevertheless, the citizen whose property is thus sacrificed for the safety and welfare of the country has his claim against that country and he has a right to compensation which exists even if no remedy in the courts or elsewhere be given. A right often exists where there is no remedy and a most frequent illustration of this is found in the relation of the subject to his sovereign, the citizen to his government.”
So far as the defendant La Abra Company is concerned, the purpose of the treaty of 1868 is not yet accomplished, and with its purpose the United States are still dealing as a *513 sovereign. When the company made application to the Government to collect its claim against the Republic of Mexico, it did. so subject to the duty of the United States to protect its citizen against the encroachments of every foreign power; but subject also to the wise and judicious discretion which the nation had a right to exercise under all the circumstances, in determining its duty to itself, the citizen, and the Government of Mexico. The Government had a right to be satisfied as to the justice of the claim before it demanded satisfaction, either by payment or arbitration, and, if satisfaction was not given, it had a right to consult its own ability and resources in deciding the question of the employment of force in the vindication of the right of the citizen. The sovereign right to determine everything connected with the claim is commensurate with the whole duty of the Government in the premises; and if at any time before the consummation of the transaction it becomes satisfied of the falsity and injustice of the claim, it is not only the right, but the duty of the Government to abandon all further action in bolialf of the citizen.
After the rendition of the award, and while the Government is in possession of the money, if from representations made by the power from which the money was derived, the Government becomes suspicious of the justice of 'the claim upon which the award was made, it then becomes the duty of the sovereign in the discharge of its obligations, as prescribed and recognized by not only international law, but all law incident to civilized nations, to seriously inquire and ascertain its duty not only toward the citizen, but toward the Government from which the money has been derived. It has been conceded that the United States have a right to retry the case before a new commission under a new treaty, but that in no other form .can they affect the integrity of the award. If the United States deals with the results of the commission which sat under the treaty of July 4,1868, as a sovereign, and not as a trustee representing rights of property, then can not they adopt such measures of inquiry as to them seem most expedient to accomplish the desired end?
It is insisted that the proceeding authorized by the act is lacking in the qualities of a law suit; that it is deficient in the necessary elements of a judicial investigation; that it is the creation upon the part of the legislature of a subject-matter *514 which in its nature is not and can not be made justiciable, that tbe domain of judicial power as to subject-matter is well defined in and by tbe law, as recognized by tbe Constitution, and that domain can not be changed by legislative authority without peril and damage to tbe coordinate branches of tbe Federal Government.
In support of that theory, we are cited to two cases in the Supreme Court, the first of which is the case of Haybwrn, reported in 2 Dallas, p. 409. That was a proceeding in mandamus, to compel the Circuit Court of Pennsylvania to put the name of Hayburn upon the pension list, in pursuance of the provisions of an act of Congress of the 23d of March, 1792. The Supreme Court declined to entertain jurisdiction of the petition, because the act imposed upon the Circuit Court, the performance of a duty which in its nature was not judicial. The court in substance decided that by the Constitution the Government of the United States is divided into three branches, that it is the duty of each to abstain from encroach-1 ments on the others, that the legislative can not constitutionally assign to the judicial the performance of any duty not strictly judicial, and that the duties assigned the Circuit Court under said act not being judicial in their nature, the court was not bound as a court to perform them.
In the case of Murray's lessees et al. v. Hoboken Land and Improvement Company (18 Howard, 282) the court after the statement of the contention of the counsel, which was that “the fact that Congress has enabled the District Court to pass upon it is conclusive evidence that it is a judicial controversy,” says, “We can not admit the correctness of the last position. If we were of opinion that this subject-matter can not be the subject of a judicial controversy and that consequently it can not be made a subject of judicial cognizance, the consequence would be that the attempt to bring it under the jurisdiction of a court of the United States would be ineffectual.” If the coordination of the three branches of the Government is the correct theory of the nature and character of the Federal Government, then it follows that the legislative branch by the passage of a law can not take from the other branches any of their constitutional power and jurisdiction. The judicial department of the Government as such by its consitution is intrusted with *515 a subject-matter of jurisdiction, which fundamentally embraces such controversies and contentions as are applicable to the individual rights of the citizen, either of property, liberty, life, or reputation; while the other departments are intrusted with the broader but not more important questions of public policy, political and international action. If the duty of the United States with reference to the award of the commission is purely political, and can not by the exercise of constitutional authority upon the part of the legislature, become the subject-mattei of personal right upon the part of a citizen, then the jurisdic tion sought to be given to the court under the act of 1892,i> lacking in the essential quality of a judicial proceeding, ano the demurrer should be sustained upon the ground that the; act is unconstitutional.
The Supreme Court has from the earliest period of the Constitution most jealously guarded the jurisdiction of the courts, and during the first seventy-five years of the Government five acts of Congress were declared to be unconstitutional, all of which related to the jurisdiction of the national judiciary.
It will be seen by a reference to the cases — Haybarn Case, (2 Dall., 209), United States v. Yale Todd (13 Howard, 52), Marbury v. Madison (1 Cranch, 137), United States v. Ferreira (13 Howard, 40), Gordon v. United States (2 Wall., o61) — that in every instance the enactment of the statute was an effort upon the part of Congress to increase the jurisdiction of the courts by requiring of them the performance of a duty which in itself was not judicial. It is a most remarkable coincidence that in all of the cases the unconstitutionality of the acts grew out of an increase rather than a diminution of the jurisdiction of the judiciary. It happily illustrates that broad and generous confidence which the popular branch of the Government has reposed in the more limited department, in not regarding its jurisdiction with selfish jealousy.
In this connection we are brought directly to consider the provisions and purpose of the act of 1892. In 1877 the political branch of the Government found itself in the possession of a large amount of money, which came to it through the medium of an award of a mixed commission; the basis of that award was a claim which belonged to citizens of the United States; the power from which it was obtained alleged that the *516 award in favor of the United States had been procured by .fraud; that its retention and distribution by the United States would be in violation of that good faith which from the requirements of international law should always subsist between nations; and in consideration of the premises, the power paying the money asked that the question of its liability might be examined in some form, not as a matter of right in resistance to the judgment of the arbitration, but as a matter of grace and favor. The Government of the United States became most seriously impressed by the gravity of the charge and the evidence to sustain it; and in .the exercise of its powers and duties as a sovereign determines that it will inquire as to the truth of the charge of fraud, and from the result of that examination discharge its duty to itself, as the sovereign of the citizen, and to the Bepublic of Mexico. Can there be any serious question as to the obligation and duty of the Government if while it has the control of the fund, it becomes suspicious of the justice of the judgment which it has recovered against Mexico?
The Government, in pursuance of what it believed to be its duty in the premises, passed the act of June 18,1878 (20 Stat. L., 144), which provides: That the President is requested to investigate any charges of fraud presented by the Mexican Government as to the cases of Benjamin Weil and La Abra Mining Company, and if he shall be of the opinion, “That the honor of the United States, the principles 0f public law, or considerations of justice and equity, require that the awards in the cases of Benjamin Weil and La Abra Silver Mining Company, or either of them, should be opened and the cases retried, it shall be lawful for him to withhold ' pay mei it of said awards, or either of them, until such case, or cases, shall be retried and decided in such manner as the Government of the United States and Mexico may agree, or until Congress shall otherwise direct.”
That statute became the subject of judicial review in the two eases of Frelinghuysen v. Key and Boynton v. Blaine, and in both cases it received the sanction of the Supreme Court as constitutional and proper legislation.
It was held in the Frelinghuysen case, .as to the act of 1878, “ That it was only an expression of the desire of Congress to *517 have the charges investigated, but did not limit or increase the executive powers in that respect under preexisting law.” (Frelinghuysen v. Key, 110 U. S., 64.)
The act of December 28, 1892, is an act to amend and enlarge the act approved June 18, 1878, and carries out the general policy of investigation as recognized by the act of1878. In the view which we now take of the decision in the case of Boynton v. Blaine, we eliminate from the consideration of this case all speculation upon the subject of whether the United States is a sovereign or trustee; .whether the company has a vested right of property in the fund, or award, and whether the claim is in abeyance or in esse, and place our conclusion as to the legality of the act of 1892 upon what is said in that case.
The court, in the conclusion of the opinion, held in substance that so long as the political branch of the Government had not1 lost control of the fund, that the claimant as between itself and the Government was not in a position to insist on the conclusiveness of the award; that by the act of 1878 that control was expressly reserved, and that such control was to be kept until a retrial could be had in an international tribunal if the two Governments so agreed, or in a domestic tribunal if Congress so directed. It seenrs to us that the very legislation which the Supreme Court anticipated in its decision as the outcome of the legislation of 1878 followed in the legislation of 1892. The last-named act provided a more effective and appropriate form of investigation than could be instituted under the act of 1878 by the President, in converting the process of investigation into the judicial forum; and one of the recitals in the act is “the executive govern ment is not furnished with means of instituting and pursuing methods of investigation which can coerce the production of evidence, or compel the examination of parties and witnesses.”
By the act of 1892 the United States recognizes the fact of the claim of the company to the unpaid portion of the award, and by that recognition establishes in the company the existence of a right, which becomes the subject-matter of judicial cognizance by the fact that it is recognized; and by the force of the statute it passes from a mere grace as against the sovereign to a right susceptible of justiciable determination.
The recognition by the United States of the claim of the *518 company lias imparted to it the qualities of property which, as between the company and the United States for the purpose, not of determining a political question, but to ascertain a fact, is sufficient to support the judicial proceeding contemplated by the statute. Congress, by the act of 1892, declared a trust in the remaining funds for the purpose of determining the question of fraud urged by the Bepublic of Mexico, and conferred on this and the Supreme Court the judicial power of deciding that question. The statute provides, “ to determine whether the award made by the United States and Mexican Mixed Commission in respect to the claim o'f the said La Abra Silver Mining Company was obtained as to the whole sum included therein or as to any part thereof by fraud effectuated by means of false swearing or other false or fraudulent practices on the part of said La Abra Company.” Congress having recognized the claim, there was by the force of that recognition a justiciable right which might be made the basis of judicial jurisdiction, as it is by the provisions of the act.
The act of 1892 having recognized a claim on the part of the company, equitable in its character, and Mexico, in subordination to the judgment of the commission, having questioned the justice of the claim, the Government finds itself in the condition of a trustee, having in its possession money to which it lays no claim as property, files this bill in the form of a bill of interpleader, or to quiet title, to have judicially determined its duty with reference to the money as property. The unpaid balance of the award by the act of 1892 belongs either to the company or the Bepublic of Mexico, and while Mexico is not a claimant, in the language of one of its communications to the State Department it is said, “not to prevent the awards made by the umpire in the now extinct Mixed Claims Commission, but only in the interest of rectitude and justice to render manifest the fraud committed by the parties interested.”
Aside from the constitutional question raised by the demurrer as to the right of Congress to pass any law upon the subject, the legislation is most appropriate to the condition of the fund. The Government of Mexico insists, in the language of the statute, that the award was obtained by fraud, effectuated by means of false swearing, or other false or fraudulent practices on the part of the company, and as the experience of mankind proves that the most approved form of investigation *519 of questions of that kind is to be found in and by tbe rules of investigation established by judicial tribunals, it was eminently proper that Congress in the absence of a treaty should adopt the judicial form of inquiry.
It is further specially alleged in the demurrer that the United States have no interest in the proceeding; that the Government of Mexico is the party interested; that since the discovery of the alleged fraud the said Government has had a remedy by suit' against the wrongdoers in the courts of the United States; that Mexico is guilty of laches in not pursuing that remedy; that therefore the United States are not entitled to the relief sought; that the matter is res judicata; that the act is unconstitutional because it assumes to bind the court in the adjudication of the questions submitted; that a new trial can not be granted by an act of Congress, and that the provisions of the act are in derogation of the fundamental rights and powers of judicial authority.
We have already adverted to the relation of the United States to the fund in controversy, and the claim of the company incident to it, by the terms of the act of 1892, and it is not now necessary to enlarge upon that branch of the case. If Mexico had sought the jurisdiction of the courts of the United States, in litigation with the company, it would have been an attack on the integrity of the judgment of the commission in direct violation of the terms of the treaty and the principles of international law applicable to the results of mixed commissions. That course was at one time contemplated by Mexico, and bills were prepared for that purpose; but upon most serious objections by the Secretary of State of the United States it was abandoned.
In support of one of the objections raised by the demurrer it is contended that the terms of the statute attempts to control the 11 adjudication, discretion, and action of the court,” and that as a result of such interference and control the judicial discretion and prerogative of the court in reaching a decree is impaired and destroyed. In support of this contention our attention is called to the case of the United States v. Throckmorton (98 U. S., 61-68).
The statute provides that “ full jurisdiction is hereby conferred on the Court of Claims to hear and determine such suit, and to make all interlocutory and final decrees therein as the *520 evidence may. warrant according- to the principles of equity and justice, and to enforce the same by injunction or any proper final process, and in all respects to proceed in said cause according to law and the rules of said court so far as the same are applicable. And the Secretary of State shall certify to said court copies of all proofs admitted by said mixed commission on the original trial of said claim and the said court shall receive and consider the same in connection with such competent evidence as may be offered by either party to said suit.”
In this connection it becomes material for us to inquire whether the investí g’ation and trial contemplated by the act of 1892 is to be based upon such testimony as was before the commission, and such competent testimony as may be offered by either party, or whether the trial and investigation may proceed upon such testimony as was heard by the commission on the original trial.
In the Throckmorton case it is in substance decided that the frauds for which a bill will lie to set aside a judgment or decree between the same parties, rendered by a court of competent jurisdiction, are those which are extrinsic of collateral to the matter tried, and not a fraud which was in issue in the former suit.
The rule of law announced in that case is but a repetition of the doctrine of many cases, and were this an ordinary proceeding in review of the finding and judgment of a court, such cases would be applicable; but the trial and investigation provided by the law of 1892 is not subject to the rules applicable to proceedings in chancery to set aside a judgment or decree.
The case is to proceed upon “ the proofs admitted by the mixed commission in connection with such competent evidence as may be offered by either party,” and the court is to consider the whole evidence in arriving at a conclusion as to whether the finding of the commission was procured by fraud on the part of the company. It is not a trial upon newly discovered evidence in the technical sense of the law, but upon the whole evidence such as has been offered and such as may be offered.
The United States by the act of 1892 suspended their relation to the fund as a sovereign; and by the terms of that act recognized a right in the defendants, but subjected that right to the provisipns of the statute which recognizes it.
*521 Whatever claim the defendants have to the fond in the possession of the Government is subservient to the terms and provisions of the statute, and they can not complain of its provisions, because from it proceed their rights. They are under legal obligations to become subject to the jurisdiction of the court, because they as against the sovereign insist upon a recognition and adjustment of their claim. It may not be within the power of Congress to subject the ordinary rights of property of the citizen against the will of the owner to the jurisdiction of this court; but in this case, because of its peculiar subject-matter, it is constitutional for Congress to impose the conditions and terms of the act of 1892.
As the substance of the other objections appearing in the demurrer are discussed and determined in what has been said upon other branches of the case, it is not necessary to notice them in detail.
If the court upon an examination of the cause, in the light of the original proof and such competent evidence as may be offered, should come to the conclusion that the award by the commission was obtained through fraud effectuated by false swearing or other false and fraudulent practices of said company, then it will be the duty of the court to decree that the company, its legal representatives and assigns, be barred and foreclosed from all claim to the money, or part thereof, so paid by the Republic of Mexico, and upon the faith of that finding, subject to an appeal to the Supremé Court of the United States, the President is authorized to return to the Government of Mexico the money still remaining in the custody of the United States.
Inasmuch as this opinion holds that the statute is constitutional in its entire scope, it is not necessary to discuss the question as to whether it is g.ood to a certain extent, and would authorize the finding upon the part of the court as to the fact whether a fraud was committed in procuring the award from and through the commission.
As there is no express provision for a decree in favor of the defendants, it is objected to the statute that in that particular it is defective in the requirements of a constitutional law.
The scope and purpose of the act is to submit to the decision of the court the question as to whether the award was obtained “by fraud effectuated by means of false swearing or other false *522 and fraudulent practicesand if tbe issue is found for the United States, then, as a result of that finding, it-is made the duty of the President to return the money, but if the issue is found for the defendants as to said money, or a severable part of the same, then it is made the duty of the Secretary of State to proceed to distribute so much of the said award as shall be found not obtained by fraud.
The directions of the statute as to the character of the decree seem to be without doubt, and as the court in the trial of the cause is in the exercise of equity powers, it would find no difficulty in entering such a decree as will carry out the purpose of the statute. If the court should decide that no fraud or fraudulent practice was perpetrated by the company in procuring the award, then the decree would specifically find that fact, which would be in law a finding for the company, and upon that finding in form of a decree it would be the duty of the Secretary of State to pay the money to the company or its assignees. As to the point made in the demurrer, that the act of 1892 is unconstitutional, upon the ground that it was not legally approved by the President, reference is made to the opinion of Judge Nott, in the case of The United States v. Alice Weil (post) administratrix, submitted at the present term. This case and the case of Weil, although referred by different statutes, present the same question of approval by the Presi-ident. The statutes are in exact terms except as to name, were passed and approved at the same tim.e. Assuming as true (as we are authorized by the demurrer) the charges of the bill constituting the alleged fraud, the court overrules the demurrer on ou the question of jurisdiction and the sufficiency of the bill, and leave is granted respondents to answer or plead if they so desire by the 1st day of July.
Davis, J., did not sit in this case and took no part in the decision.